# STATE OIL CO. *v.* KHAN ET AL.

No. 96–871.  Argued October 7, 1997—Decided November 4, 1997

4

O'Connor, J., delivered the opinion for a unanimous Court.

*John Baumgartner* argued the cause for petitioner. With him on the briefs was *Paul Kalinich.*

*Acting Assistant Attorney General Klein* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Acting Solicitor General Dellinger, Deputy Solicitor General Wallace, Deputy Assistant Attorney General Melamed, Edward C. DuMont, Catherine G. O'Sullivan,* and *David Seidman.*

*Anthony S. DiVincenzo* argued the cause and filed a brief for respondents.

*Pamela Jones Harbour,* Deputy Attorney General of New York, argued the cause for the state parties as *amici curiae* urging affirmance. With her on the brief were *Dennis C. Vacco,* Attorney General of New York, *Barbara Gott Billet,* Solicitor General, and *Stephen D. Houck, Robert L. Hubbard, Darrell M. Joseph,* and *John A. Ioannou,* Assistant Attorneys General, *Bruce M. Botelho,* Attorney General of Alaska, and *Daveed A. Schwartz,* Assistant Attorney General, *Grant Woods,* Attorney General of Arizona, *Winston Bryant,* Attorney General of Arkansas, and *J. Jordan Abbott,* Assistant Attorney General, *Richard Blumenthal,* Attorney General of Connecticut, *M. Jane Brady,* Attorney General of Delaware, *Robert A. Butterworth,* Attorney General of Florida, and *Patricia A. Conners,* Assistant Attorney General, *Calvin E. Halloway, Sr.,* Attorney General of Guam, *Margery S. Bronster,* Attorney General of Hawaii, *Alan G. Lance,* Attorney

General of Idaho, and *Brett T. DeLange,* Deputy Attorney General, *Jim Ryan,* Attorney General of Illinois, and *Barbara Preiner,* Solicitor General, *Thomas J. Miller,* Attorney General of Iowa, and *Elizabeth M. Osenbaugh,* Solicitor General, *Carla J. Stovall,* Attorney General of Kansas, and *John W. Campbell,* Deputy Attorney General, *J. Joseph Curran, Jr.,* Attorney General of Maryland, and *Ellen S. Cooper,* Assistant Attorney General, *Frank J. Kelley,* Attorney General of Michigan, and *Fredrick H. Hoffecker, Hubert H. Humphrey III,* Attorney General of Minnesota, *Mike Moore,* Attorney General of Mississippi, and *James F. Steel,* Deputy Attorney General, *Joseph P. Mazurek,* Attorney General of Montana, *Frankie Sue Del Papa,* Attorney General of Nevada, *Steven M. Houran,* Acting Attorney General of New Hampshire, and *Walter L. Maroney,* Senior Assistant Attorney General, *Peter Verniero,* Attorney General of New Jersey, and *Laurel A. Price,* Deputy Attorney General, *Tom Udall,* Attorney General of New Mexico, and *Susan G. White,* Assistant Attorney General, *Michael F. Easley,* Attorney General of North Carolina, and *K. D. Sturgis,* Assistant Attorney General, *Heidi Heitkamp,* Attorney General of North Dakota, and *Laurie J. Loveland,* Solicitor General, *D. Michael Fisher,* Attorney General of Pennsylvania, and *James A. Donahue III,* Acting Chief Deputy Attorney General, *Jeffrey B. Pine,* Attorney General of Rhode Island, *Mark Barnett,* Attorney General of South Dakota, *John Knox Walkup,* Attorney General of Tennessee, *Michael E. Moore,* Solicitor General, and *Dennis Garvey,* Interim Deputy Attorney General, *Dan Morales,* Attorney General of Texas, *Jorge Vega,* First Assistant Attorney General, and *Laquita A. Hamilton,* Deputy Attorney General, *James S. Gilmore III,* Attorney General of Virginia, and *Frank Seales, Jr.,* Senior Assistant Attorney General, *Christine O. Gregoire,* Attorney General of Washington, and *Jon P. Ferguson, Darrell V. McGraw, Jr.,* Attorney General of West Virginia, *James E. Doyle,* Attorney General of Wisconsin,

and *Kevin J. O'Connor*, Assistant Attorney General, and *William U. Hill*, Attorney General of Wyoming.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Under § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, "[e]very contract, combination . . . , or conspiracy, in restraint of trade" is illegal. In *Albrecht* v. *Herald Co.*, 390 U. S. 145 (1968), this Court held that vertical maximum price fixing is a *per se* violation of that statute. In this case, we are asked to reconsider that decision in light of subsequent decisions of this Court. We conclude that *Albrecht* should be overruled.

I

Respondents, Barkat U. Khan and his corporation, entered into an agreement with petitioner, State Oil Company, to lease and operate a gas station and convenience store owned

---

*Briefs of *amici curiae* urging reversal were filed for the American Automobile Manufacturers Association et al. by *Stephen M. Shapiro, Roy T. Englert, Jr., Donald M. Falk, Phillip D. Brady*, and *Charles H. Lockwood II;* for the American Petroleum Institute by *Edwin M. Zimmerman, Robert A. Long, Jr., G. William Frick, Harry M. Ng*, and *Douglas W. Morris;* for the Business Roundtable by *Thomas B. Leary* and *Robert C. Weinbaum;* and for the Newspaper Association of America et al. by *William T. Lifland, Patricia Farren, David S. J. Brown, Rene P. Milam, Peter C. Gould, Andrew Merdek, William T. Garcia, Cristina L. Mendoza*, and *George Freeman.*

Briefs of *amici curiae* were filed for the Association of the Bar of the City of New York by *Richard M. Steuer;* for the Coalition for Fair Consumer Pricing by *Steven B. Feirman, Barry M. Heller, H.. Bret Lowell, Philip F. Zeidman*, and *Stanley J. Adelman;* for the Minnesota Service Station and Convenience Store Association et al. by *Gary E. Persian* and *Paul E. Slater;* for the National Association of Manufacturers by *Mark L. Davidson, Jan S. Amundson*, and *Quentin Riegel;* for the National Automobile Dealers Association by *Paul R. Norman;* for the National Beer Wholesalers Association, Inc., by *Ernest Gellhorn, Donald I. Baker*, and *W. Todd Miller;* and for the Service Station Dealers of America by *Peter H. Gunst.*

8

by State Oil. The agreement provided that respondents would obtain the station's gasoline supply from State Oil at a price equal to a suggested retail price set by State Oil, less a margin of 3.25 cents per gallon. Under the agreement, respondents could charge any amount for gasoline sold to the station's customers, but if the price charged was higher than State Oil's suggested retail price, the excess was to be rebated to State Oil. Respondents could sell gasoline for less than State Oil's suggested retail price, but any such decrease would reduce their 3.25 cents-per-gallon margin.

About a year after respondents began operating the gas station, they fell behind in lease payments. State Oil then gave notice of its intent to terminate the agreement and commenced a state court proceeding to evict respondents. At State Oil's request, the state court appointed a receiver to operate the gas station. The receiver operated the station for several months without being subject to the price restraints in respondents' agreement with State Oil. According to respondents, the receiver obtained an overall profit margin in excess of 3.25 cents per gallon by lowering the price of regular-grade gasoline and raising the price of premium grades.

Respondents sued State Oil in the United States District Court for the Northern District of Illinois, alleging in part that State Oil had engaged in price fixing in violation of § 1 of the Sherman Act by preventing respondents from raising or lowering retail gas prices. According to the complaint, but for the agreement with State Oil, respondents could have charged different prices based on the grades of gasoline, in the same way that the receiver had, thereby achieving increased sales and profits. State Oil responded that the agreement did not actually prevent respondents from setting gasoline prices, and that, in substance, respondents did not allege a violation of antitrust laws by their claim that State Oil's suggested retail price was not optimal.

The District Court found that the allegations in the complaint did not state a *per se* violation of the Sherman Act because they did not establish the sort of "manifestly anticompetitive implications or pernicious effect on competition" that would justify *per se* prohibition of State Oil's conduct. App. 43–44. Subsequently, in ruling on cross-motions for summary judgment, the District Court concluded that respondents had failed to demonstrate antitrust injury or harm to competition. App. to Pet. for Cert. 37a. The District Court held that respondents had not shown that a difference in gasoline pricing would have increased the station's sales; nor had they shown that State Oil had market power or that its pricing provisions affected competition in a relevant market. *Id.*, at 37a, 40a. Accordingly, the District Court entered summary judgment for State Oil on respondents' Sherman Act claim. *Id.*, at 40a.

The Court of Appeals for the Seventh Circuit reversed. 93 F. 3d 1358 (1996). The court first noted that the agreement between respondents and State Oil did indeed fix maximum gasoline prices by making it "worthless" for respondents to exceed the suggested retail prices. *Id.*, at 1360. After reviewing legal and economic aspects of price fixing, the court concluded that State Oil's pricing scheme was a *per se* antitrust violation under *Albrecht* v. *Herald Co.*, *supra*. Although the Court of Appeals characterized *Albrecht* as "unsound when decided" and "inconsistent with later decisions" of this Court, it felt constrained to follow that decision. 93 F. 3d, at 1363. In light of *Albrecht* and *Atlantic Richfield Co.* v. *USA Petroleum Co.*, 495 U. S. 328 (1990) *(ARCO)*, the court found that respondents could have suffered antitrust injury from not being able to adjust gasoline prices.

We granted certiorari to consider two questions, whether State Oil's conduct constitutes a *per se* violation of the Sherman Act and whether respondents are entitled to recover damages based on that conduct. 519 U. S. 1107 (1997).

II

A

Although the Sherman Act, by its terms, prohibits every agreement "in restraint of trade," this Court has long recognized that Congress intended to outlaw only unreasonable restraints. See, *e. g., Arizona* v. *Maricopa County Medical Soc.,* 457 U. S. 332, 342–343 (1982) (citing *United States* v. *Joint Traffic Assn.,* 171 U. S. 505 (1898)). As a consequence, most antitrust claims are analyzed under a "rule of reason," according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect. 457 U. S., at 343, and n. 13 (citing *Board of Trade of Chicago* v. *United States,* 246 U. S. 231, 238 (1918)).

Some types of restraints, however, have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se.* *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 5 (1958). *Per se* treatment is appropriate "[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." *Maricopa County, supra,* at 344; see also *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.,* 441 U. S. 1, 19, n. 33 (1979). Thus, we have expressed reluctance to adopt *per se* rules with regard to "restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *FTC* v. *Indiana Federation of Dentists,* 476 U. S. 447, 458–459 (1986).

A review of this Court's decisions leading up to and beyond *Albrecht* is relevant to our assessment of the continuing validity of the *per se* rule established in *Albrecht.* Beginning

with *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373 (1911), the Court recognized the illegality of agreements under which manufacturers or suppliers set the minimum resale prices to be charged by their distributors. By 1940, the Court broadly declared all business combinations "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce" illegal *per se*. *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 223 (1940). Accordingly, the Court condemned an agreement between two affiliated liquor distillers to limit the maximum price charged by retailers in *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211 (1951), noting that agreements to fix maximum prices, "no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." *Id.*, at 213.

In subsequent cases, the Court's attention turned to arrangements through which suppliers imposed restrictions on dealers with respect to matters other than resale price. In *White Motor Co.* v. *United States*, 372 U. S. 253 (1963), the Court considered the validity of a manufacturer's assignment of exclusive territories to its distributors and dealers. The Court determined that too little was known about the competitive impact of such vertical limitations to warrant treating them as *per se* unlawful. *Id.*, at 263. Four years later, in *United States* v. *Arnold, Schwinn & Co.*, 388 U. S. 365 (1967), the Court reconsidered the status of exclusive dealer territories and held that, upon the transfer of title to goods to a distributor, a supplier's imposition of territorial restrictions on the distributor was "so obviously destructive of competition" as to constitute a *per se* violation of the Sherman Act. *Id.*, at 379. In *Schwinn*, the Court acknowledged that some vertical restrictions, such as the conferral of territorial rights or franchises, could have procompetitive benefits by allowing smaller enterprises to compete, and that

12

such restrictions might avert vertical integration in the distribution process. *Id.*, at 379–380. The Court drew the line, however, at permitting manufacturers to control product marketing once dominion over the goods had passed to dealers. *Id.*, at 380.

*Albrecht*, decided the following Term, involved a newspaper publisher who had granted exclusive territories to independent carriers subject to their adherence to a maximum price on resale of the newspapers to the public. Influenced by its decisions in *Socony-Vacuum, Kiefer-Stewart,* and *Schwinn*, the Court concluded that it was *per se* unlawful for the publisher to fix the maximum resale price of its newspapers. 390 U. S., at 152–154. The Court acknowledged that "[m]aximum and minimum price fixing may have different consequences in many situations," but nonetheless condemned maximum price fixing for "substituting the perhaps erroneous judgment of a seller for the forces of the competitive market." *Id.*, at 152.

*Albrecht* was animated in part by the fear that vertical maximum price fixing could allow suppliers to discriminate against certain dealers, restrict the services that dealers could afford to offer customers, or disguise minimum price fixing schemes. *Id.*, at 152–153. The Court rejected the notion (both on the record of that case and in the abstract) that, because the newspaper publisher "granted exclusive territories, a price ceiling was necessary to protect the public from price gouging by dealers who had monopoly power in their own territories." *Id.*, at 153.

In a vigorous dissent, Justice Harlan asserted that the majority had erred in equating the effects of maximum and minimum price fixing. *Id.*, at 156–168. Justice Harlan pointed out that, because the majority was establishing a *per se* rule, the proper inquiry was "not whether dictation of maximum prices is *ever* illegal, but whether it is *always* illegal." *Id.*, at 165–166. He also faulted the majority for conclusively listing "certain unfortunate consequences that maximum

price dictation might have in other cases," even as it rejected evidence that the publisher's practice of fixing maximum prices counteracted potentially anticompetitive actions by its distributors. *Id.*, at 165. Justice Stewart also dissented, asserting that the publisher's maximum price fixing scheme should be properly viewed as promoting competition, because it protected consumers from dealers such as Albrecht, who, as "the only person who could sell for home delivery the city's only daily morning newspaper," was "a monopolist within his own territory." *Id.*, at 168.

Nine years later, in *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36 (1977), the Court overruled *Schwinn*, thereby rejecting application of a *per se* rule in the context of vertical nonprice restrictions. The Court acknowledged the principle of *stare decisis*, but explained that the need for clarification in the law justified reconsideration of *Schwinn:*

> "Since its announcement, *Schwinn* has been the subject of continuing controversy and confusion, both in the scholarly journals and in the federal courts. The great weight of scholarly opinion has been critical of the decision, and a number of the federal courts confronted with analogous vertical restrictions have sought to limit its reach. In our view, the experience of the past 10 years should be brought to bear on this subject of considerable commercial importance." 433 U. S., at 47–49 (footnotes omitted).

The Court considered the historical context of *Schwinn*, noting that *Schwinn*'s *per se* rule against vertical nonprice restrictions came only four years after the Court had refused to endorse a similar rule in *White Motor Co.*, and that the decision neither explained the "sudden change in position," nor referred to the accepted requirements for *per se* violations set forth in *Northern Pacific R. Co.* 433 U. S., at 51–52. The Court then reviewed scholarly works supporting the economic utility of vertical nonprice restraints. See *id.*,

at 54–57 (citing, *e. g.*, Posner, Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions, 75 Colum. L. Rev. 282 (1975); Preston, Restrictive Distribution Arrangements: Economic Analysis and Public Policy Standards, 30 Law & Contemp. Prob. 506 (1965)). The Court concluded that, because "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than—as in *Schwinn*—upon formalistic line drawing," the appropriate course would be "to return to the rule of reason that governed vertical restrictions prior to *Schwinn*." *GTE Sylvania, supra,* at 58–59.

In *GTE Sylvania*, the Court declined to comment on *Albrecht*'s *per se* treatment of vertical maximum price restrictions, noting that the issue "involve[d] significantly different questions of analysis and policy." 433 U. S., at 51, n. 18. Subsequent decisions of the Court, however, have hinted that the analytical underpinnings of *Albrecht* were substantially weakened by *GTE Sylvania*. We noted in *Maricopa County* that vertical restraints are generally more defensible than horizontal restraints. See 457 U. S., at 348, n. 18. And we explained in *324 Liquor Corp.* v. *Duffy*, 479 U. S. 335, 341–342 (1987), that decisions such as *GTE Sylvania* "recognize the possibility that a vertical restraint imposed by a *single* manufacturer or wholesaler may stimulate interbrand competition even as it reduces intrabrand competition."

Most recently, in *ARCO*, 495 U. S. 328 (1990), although *Albrecht*'s continuing validity was not squarely before the Court, some disfavor with that decision was signaled by our statement that we would "assume, *arguendo*, that *Albrecht* correctly held that vertical, maximum price fixing is subject to the *per se* rule." 495 U. S., at 335, n. 5. More significantly, we specifically acknowledged that vertical maximum price fixing "may have procompetitive interbrand effects," and pointed out that, in the wake of *GTE Sylvania*, "[t]he

procompetitive potential of a vertical maximum price restraint is more evident . . . than it was when *Albrecht* was decided, because exclusive territorial arrangements and other nonprice restrictions were unlawful *per se* in 1968." 495 U. S., at 343, n. 13 (citing several commentators identifying procompetitive effects of vertical maximum price fixing, including, *e. g.*, P. Areeda & H. Hovenkamp, Antitrust Law ¶ 340.30b, p. 378, n. 24 (1988 Supp.); Blair & Harrison, Rethinking Antitrust Injury, 42 Vand. L. Rev. 1539, 1553 (1989); Easterbrook, Maximum Price Fixing, 48 U. Chi. L. Rev. 886, 887–890 (1981)) (hereinafter Easterbrook).

## B

Thus, our reconsideration of *Albrecht*'s continuing validity is informed by several of our decisions, as well as a considerable body of scholarship discussing the effects of vertical restraints. Our analysis is also guided by our general view that the primary purpose of the antitrust laws is to protect interbrand competition. See, *e. g.*, *Business Electronics Corp.* v. *Sharp Electronics Corp.*, 485 U. S. 717, 726 (1988). "Low prices," we have explained, "benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *ARCO, supra*, at 340. Our interpretation of the Sherman Act also incorporates the notion that condemnation of practices resulting in lower prices to consumers is "especially costly" because "cutting prices in order to increase business often is the very essence of competition." *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 594 (1986).

So informed, we find it difficult to maintain that vertically imposed maximum prices could harm consumers or competition to the extent necessary to justify their *per se* invalidation. As Chief Judge Posner wrote for the Court of Appeals in this case:

"As for maximum resale price fixing, unless the supplier is a monopsonist he cannot squeeze his dealers' margins

below a competitive level; the attempt to do so would just drive the dealers into the arms of a competing supplier. A supplier might, however, fix a maximum resale price in order to prevent his dealers from exploiting a monopoly position. . . . [S]uppose that State Oil, perhaps to encourage . . . dealer services . . . has spaced its dealers sufficiently far apart to limit competition among them (or even given each of them an exclusive territory); and suppose further that Union 76 is a sufficiently distinctive and popular brand to give the dealers in it at least a modicum of monopoly power. Then State Oil might want to place a ceiling on the dealers' resale prices in order to prevent them from exploiting that monopoly power fully. It would do this not out of disinterested malice, but in its commercial self-interest. The higher the price at which gasoline is resold, the smaller the volume sold, and so the lower the profit to the supplier if the higher profit per gallon at the higher price is being snared by the dealer." 93 F. 3d, at 1362.

See also R. Bork, The Antitrust Paradox 281–282 (1978) ("There could, of course, be no anticonsumer effect from [the type of price fixing considered in *Albrecht*], and one suspects that the paper has a legitimate interest in keeping subscriber prices down in order to increase circulation and maximize revenues from advertising").

We recognize that the *Albrecht* decision presented a number of theoretical justifications for a *per se* rule against vertical maximum price fixing. But criticism of those premises abounds. The *Albrecht* decision was grounded in the fear that maximum price fixing by suppliers could interfere with dealer freedom. 390 U. S., at 152. In response, as one commentator has pointed out, "the ban on maximum resale price limitations declared in *Albrecht* in the name of 'dealer freedom' has actually prompted many suppliers to integrate forward into distribution, thus eliminating the very independent trader for whom *Albrecht* professed solicitude."

8 P. Areeda, Antitrust Law ¶ 1635, p. 395 (1989) (hereinafter Areeda). For example, integration in the newspaper industry since *Albrecht* has given rise to litigation between independent distributors and publishers. See P. Areeda & H. Hovenkamp, *supra*, ¶ 729.7, pp. 599–614 (1996 Supp.).

The *Albrecht* Court also expressed the concern that maximum prices may be set too low for dealers to offer consumers essential or desired services. 390 U. S., at 152–153. But such conduct, by driving away customers, would seem likely to harm manufacturers as well as dealers and consumers, making it unlikely that a supplier would set such a price as a matter of business judgment. See, *e. g.*, Lopatka, Stephen Breyer and Modern Antitrust: A Snug Fit, 40 Antitrust Bull. 1, 60 (1995); Blair & Lang, *Albrecht* After *ARCO:* Maximum Resale Price Fixing Moves Toward the Rule of Reason, 44 Vand. L. Rev. 1007, 1034 (1991). In addition, *Albrecht* noted that vertical maximum price fixing could effectively channel distribution through large or specially advantaged dealers. 390 U. S., at 153. It is unclear, however, that a supplier would profit from limiting its market by excluding potential dealers. See, *e. g.*, Easterbrook 905–908. Further, although vertical maximum price fixing might limit the viability of inefficient dealers, that consequence is not necessarily harmful to competition and consumers. See, *e. g.*, *id.*, at 907; Lopatka, *supra*, at 60.

Finally, *Albrecht* reflected the Court's fear that maximum price fixing could be used to disguise arrangements to fix minimum prices, 390 U. S., at 153, which remain illegal *per se*. Although we have acknowledged the possibility that maximum pricing might mask minimum pricing, see *Maricopa County*, 457 U. S., at 348, we believe that such conduct—as with the other concerns articulated in *Albrecht*—can be appropriately recognized and punished under the rule of reason. See, *e. g.*, Easterbrook 901–904; see also Pitofsky, In Defense of Discounters: The No-Frills Case for a *Per Se*

Rule Against Vertical Price Fixing, 71 Geo. L. J. 1487, 1490, n. 17 (1983).

Not only are the potential injuries cited in *Albrecht* less serious than the Court imagined, the *per se* rule established therein could in fact exacerbate problems related to the unrestrained exercise of market power by monopolist-dealers. Indeed, both courts and antitrust scholars have noted that *Albrecht*'s rule may actually harm consumers and manufacturers. See, *e. g., Caribe BMW, Inc.* v. *Bayerische Motoren Werke Aktiengesellschaft,* 19 F. 3d 745, 753 (CA1 1994) (Breyer, C. J.); Areeda ¶ 1636a, at 395; G. Mathewson & R. Winter, Competition Policy and Vertical Exchange 13–14 (1985). Other commentators have also explained that *Albrecht*'s *per se* rule has even more potential for deleterious effect on competition after our decision in *GTE Sylvania,* because, now that vertical nonprice restrictions are not unlawful *per se,* the likelihood of dealer monopoly power is increased. See, *e. g.,* Easterbrook 890, n. 20; see also *ARCO,* 495 U. S., at 343, n. 13. We do not intend to suggest that dealers generally possess sufficient market power to exploit a monopoly situation. Such retail market power may in fact be uncommon. See, *e. g., Business Electronics,* 485 U. S., at 727, n. 2; *GTE Sylvania,* 433 U. S., at 54. Nor do we hold that a ban on vertical maximum price fixing inevitably has anticompetitive consequences in the exclusive dealer context.

After reconsidering *Albrecht*'s rationale and the substantial criticism the decision has received, however, we conclude that there is insufficient economic justification for *per se* invalidation of vertical maximum price fixing. That is so not only because it is difficult to accept the assumptions underlying *Albrecht,* but also because *Albrecht* has little or no relevance to ongoing enforcement of the Sherman Act. See *Copperweld Corp.* v. *Independence Tube Corp.,* 467 U. S. 752, 777, and n. 25 (1984). Moreover, neither the parties nor any

of the *amici curiae* have called our attention to any cases in which enforcement efforts have been directed solely against the conduct encompassed by *Albrecht's per se* rule.

Respondents argue that reconsideration of *Albrecht* should require "persuasive, expert testimony establishing that the *per se* rule has distorted the market." Brief for Respondents 7. Their reasoning ignores the fact that *Albrecht* itself relied solely upon hypothetical effects of vertical maximum price fixing. Further, *Albrecht's* dire predictions have not been borne out, even though manufacturers and suppliers appear to have fashioned schemes to get around the *per se* rule against vertical maximum price fixing. In these circumstances, it is the retention of the rule of *Albrecht*, and not, as respondents would have it, the rule's elimination, that lacks adequate justification. See, *e. g., GTE Sylvania, supra*, at 58–59.

Respondents' reliance on *Toolson* v. *New York Yankees, Inc.*, 346 U. S. 356 (1953) *(per curiam)*, and *Flood* v. *Kuhn*, 407 U. S. 258 (1972), is similarly misplaced, because those decisions are clearly inapposite, having to do with the antitrust exemption for professional baseball, which this Court has described as "an aberration . . . rest[ing] on a recognition and an acceptance of baseball's unique characteristics and needs," *id.*, at 282. In the context of this case, we infer little meaning from the fact that Congress has not reacted legislatively to *Albrecht*. In any event, the history of various legislative proposals regarding price fixing seems neither clearly to support nor to denounce the *per se* rule of *Albrecht*. Respondents are of course free to seek legislative protection from gasoline suppliers of the sort embodied in the Petroleum Marketing Practices Act, 92 Stat. 322, 15 U. S. C. § 2801 *et seq.* For the reasons we have noted, however, the remedy for respondents' dispute with State Oil should not come in the form of a *per se* rule affecting the conduct of the entire marketplace.

## C

Despite what Chief Judge Posner aptly described as *Albrecht*'s "infirmities, [and] its increasingly wobbly, motheaten foundations," 93 F. 3d, at 1363, there remains the question whether *Albrecht* deserves continuing respect under the doctrine of *stare decisis.* The Court of Appeals was correct in applying that principle despite disagreement with *Albrecht*, for it is this Court's prerogative alone to overrule one of its precedents.

We approach the reconsideration of decisions of this Court with the utmost caution. *Stare decisis* reflects "a policy judgment that 'in most matters it is more important that the applicable rule of law be settled than that it be settled right.'" *Agostini* v. *Felton*, 521 U. S. 203, 235 (1997) (quoting *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406 (1932) (Brandeis, J., dissenting)). It "is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). This Court has expressed its reluctance to overrule decisions involving statutory interpretation, see, *e. g., Illinois Brick Co.* v. *Illinois*, 431 U. S. 720, 736 (1977), and has acknowledged that *stare decisis* concerns are at their acme in cases involving property and contract rights, see, *e. g., Payne*, 501 U. S., at 828. Both of those concerns are arguably relevant in this case.

But "*[s]tare decisis* is not an inexorable command." *Ibid.* In the area of antitrust law, there is a competing interest, well represented in this Court's decisions, in recognizing and adapting to changed circumstances and the lessons of accumulated experience. Thus, the general presumption that legislative changes should be left to Congress has less force with respect to the Sherman Act in light of the accepted view that Congress "expected the courts to give shape to the statute's broad mandate by drawing on common-law tra-

dition." *National Soc. of Professional Engineers* v. *United States*, 435 U. S. 679, 688 (1978). As we have explained, the term "restraint of trade," as used in § 1, also "invokes the common law itself, and not merely the static content that the common law had assigned to the term in 1890." *Business Electronics*, 485 U. S., at 732; see also *GTE Sylvania*, 433 U. S., at 53, n. 21; *McNally* v. *United States*, 483 U. S. 350, 372–373 (1987) (STEVENS, J., dissenting). Accordingly, this Court has reconsidered its decisions construing the Sherman Act when the theoretical underpinnings of those decisions are called into serious question. See, *e. g., Copperweld Corp., supra*, at 777; *GTE Sylvania, supra*, at 47–49; cf. *Tigner* v. *Texas*, 310 U. S. 141, 147 (1940).

Although we do not "lightly assume that the economic realities underlying earlier decisions have changed, or that earlier judicial perceptions of those realities were in error," we have noted that "different sorts of agreements" may amount to restraints of trade "in varying times and circumstances," and "[i]t would make no sense to create out of the single term 'restraint of trade' a chronologically schizoid statute, in which a 'rule of reason' evolves with new circumstances and new wisdom, but a line of *per se* illegality remains forever fixed where it was." *Business Electronics, supra*, at 731–732. Just as *Schwinn* was "the subject of continuing controversy and confusion" under the "great weight" of scholarly criticism, *GTE Sylvania, supra*, at 47–48, *Albrecht* has been widely criticized since its inception. With the views underlying *Albrecht* eroded by this Court's precedent, there is not much of that decision to salvage. See, *e. g., Neal* v. *United States*, 516 U. S. 284, 295 (1996); *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 173 (1989); *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 480–481 (1989).

Although the rule of *Albrecht* has been in effect for some time, the inquiry we must undertake requires considering "'the effect of the antitrust laws upon vertical distributional

restraints in the American economy today.'" *GTE Sylvania, supra,* at 53, n. 21 (quoting *Schwinn,* 388 U. S., at 392 (Stewart, J., concurring in part and dissenting in part)). As the Court noted in *ARCO,* 495 U. S., at 336, n. 6, there has not been another case since *Albrecht* in which this Court has "confronted an unadulterated vertical, maximum-price-fixing arrangement." Now that we confront *Albrecht* directly, we find its conceptual foundations gravely weakened.

In overruling *Albrecht,* we of course do not hold that all vertical maximum price fixing is *per se* lawful. Instead, vertical maximum price fixing, like the majority of commercial arrangements subject to the antitrust laws, should be evaluated under the rule of reason. In our view, rule-of-reason analysis will effectively identify those situations in which vertical maximum price fixing amounts to anticompetitive conduct.

There remains the question whether respondents are entitled to recover damages based on State Oil's conduct. Although the Court of Appeals noted that "the district judge was right to conclude that if the rule of reason is applicable, Khan loses," 93 F. 3d, at 1362, its consideration of this case was necessarily premised on *Albrecht's per se* rule. Under the circumstances, the matter should be reviewed by the Court of Appeals in the first instance. We therefore vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*