Iain **FRASER**; Steve Trittschuh; Sean Bowers; Mark Semioli; Rhett Harty; David Scott Vaudreuil; Mark Dodd; and Mark Dougherty, Plaintiffs,

v.

**MAJOR LEAGUE SOCCER, L.L.C.**; Kraft Soccer, L.P.; Anschutz Soccer, Inc.; Team Columbus Soccer L.L.C.; Team Kansas City Soccer L.L.C.; Los Angeles Soccer Partners, L.P.; Empire Soccer Club, L.P.; Washington Soccer, L.P.; and United States Soccer Federation, Inc., Defendants.

Civil Action No. 97–10342–GAO.

United States District Court,
D. Massachusetts.

Jan. 28, 1998.

---

Paul B. Galvani, Jane Wilis, Ropes & Gray, Boston, MA, James W. Quinn, Weil, Gotshal & Manges, New York City, Richard A. Berthelsen, Washington, DC, Suja A. Thomas, Weil, Gotshal & Manges L.L.P., New York City, for Iain Fraser, Steve Trittschuh, Sean Bowers, Mark Semiolo, Rhett Harty, David Scott Vaudreuil, Mark Dodd, Mark Dougherty.

Paul B. Galvani, Jane Wilis, Ropes & Gray, Boston, MA, James W. Quinn, Weil, Gotshal & Manges, New York City, Richard A. Berthelsen, Washington, DC, for Paul Caliguiri, Tim Martin.

Daniel S. Savrin, Daniel L. Goldberg, Bingham, Dana & Gould, Boston, MA, Michael A. Cardoza, L. Robert Batterman, Steven C. Krane, Walter Eliot Bard, Proskauer, Rose, Goetz & Mendelsohn, New York City, for Major League Soccer, L.L.C. Robert Kraft, Philip F. Anschutz, Hunt Sports Investments, Los Angeles Soccer Partners, L.P., Metromedia Co., Washington Soccer, L.P.

Nicholas DiGiovanni, Jr., Joseph McConnell, Morgan, Brown & Joy, Boston, MA, Daniel S. Savrin, Daniel L. Goldberg, Bingham, Dana & Gould, Boston, MA, Michael A. Cardoza, L. Robert Batterman, Steven C. Krane, Walter Eliot Bard, Proskauer, Rose, Goetz & Mendelsohn, New York City, for United States Soccer Federation, Inc.

Paul B. Galvani, Ropes & Gray, Boston, MA, Walter Eliot Bard, Proskauer, Rose, Goetz & Mendelsohn, New York City, for Kraft Soccer, L.P., Anschutz Soccer, Inc., Team Columbus Soccer, Team Kansas City Soccer, L.L.C., Empire Soccer Club, L.P.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

In this private antitrust action for injunctive relief, the class plaintiffs Iain Fraser, Steve Trittschuh, Sean Bowers, Mark Semioli, Rhett Harty, David Scott Vaudreuil, Mark

Dodd and Mark Dougherty have moved for Summary judgment under Count II of their complaint, and for an order permanently enjoining the defendants, Major League Soccer, L.L.C. ("MLS") and its individual "operator/investors," from enforcing a "transfer fee" imposed on the defendants pursuant to the "Regulations Governing the Status and Transfer of Football Players," adopted by the Fédération International de Football Association ("FIFA").[1]

The relevant FIFA rules provide that if a soccer player concludes a "contract with a new club, his former club shall be entitled to compensation for his training and/or development." Shapiro Aff., Ex. D., ch. V., art. 14, § 1, "Regulations Governing the Status and Transfer of Football Players" (English ed. January 1994) (the "FIFA Rules"). If the two clubs cannot agree on a fee, the dispute will be referred to FIFA, which may order the new club to pay compensation to the old club. Shapiro Aff, Ex. D, ch. V, art. 17. These rules apply to players whose contracts with their former clubs have expired ("out-of-contract-players") as well as to players whose contracts have not yet expired ("in-contract players"). MLS incorporates the FIFA rules by reference in the Standard Player Agreement that each soccer player signs upon employment with MLS. That contract provides that "a player's right to play professional soccer in the United States is subject to rules and regulations promulgated by FIFA."

The plaintiffs argue that the application of the transfer fee to out-of-contract players is a agreement among horizontal competitors (the members of FIFA) limiting the terms under which players may engage in price competition, and consequently it is a *per se* illegal restraint of trade unlawful under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The defendants have cross-moved for summary judgment on the ground that MLS has never paid or requested a transfer fee for an out-of-contract player and does not

intend to do so in the future. For the following reasons, both motions are denied.

### Defendants' Cross Motion for Summary Judgment

The defendants assert, by means of an affidavit signed by the commissioner of MLS, that MLS has never paid or demanded a transfer fee for an out-of-contract player, and that it intends never to do so. Logan Aff. Therefore, say the defendants, the transfer fee issue is not ripe for consideration or, alternatively, it is moot. They are wrong in both respects.

■ The issue is ripe for consideration even though MLS has yet to pay or request a transfer fee. A rule that has yet to be enacted or enforced may be ripe for review if it may have the effect of inhibiting competition. *See, e.g., North American Soccer League v. National Football League,* 465 F.Supp. 665 (S.D.N.Y.1979) (preliminarily enjoining enactment of proposed amendment to NFL's constitution as likely to violate the antitrust laws). Section 16 of the Clayton Act authorizes an action for injunctive relief "against *threatened* loss or damage by a violation of the antitrust law." 15 U.S.C. § 26 (emphasis added). The Supreme Court has held that such relief "is characteristically available even though the plaintiff has not yet suffered actual injury; he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (internal citations omitted). Moreover, it is plausible that the existence of this rule, alone, without any actual enforcement of it, may have an anticompetitive effect.

■ Nor is the transfer fee question moot. MLS has declined to enter into a formal stipulation that it will never pay a transfer fee, and its present assurances to that effect are not binding. Presumably, as a member of FIFA, MLS remains obliged to

---

**1.** The players had originally asserted this claim against the United States Soccer Federation, Inc. (the "USSF"), as well, but USSF has since entered into a stipulation that it never has and never will pay nor request a transfer fee payment for an out-of-contract player. As a result, the players have withdrawn Count II as against the USSF. The USSF has no teams of its own, so it is unlikely that it would have paid a transfer fee absent the stipulation.

follow FIFA's regulations. The MLS standard player contract requires each player to promise to abide by those regulations. In antitrust cases, any abandonment of a conspiracy or agreement must be clearly established. *See, e.g., United States v. Parke, Davis & Co.,* 362 U.S. 29, 48, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) (A court should not lightly infer an abandonment of unlawful activities "from a cessation which seems timed to anticipate suit."); *United States v. Oregon State Medical Soc'y,* 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952) ("When defendants are shown to have ... entered into a conspiracy violative of the antitrust laws, courts will not assume that it has been abandoned without clear proof.").

The defendants cross motion for summary judgment must be denied.

### *Plaintiffs' Motion for Summary Judgment*

■ The plaintiffs argue that the transfer fee rule constitutes a *per se* violation of the Sherman Act's prohibition against restraints on trade. The Court concludes, rather, that the restraint should be analyzed under a "rule of reason," and cannot be condemned as a *per se* violation. Under a "rule of reason" analysis, the plaintiffs must show that the anticompetitive effects of the rule outweigh any procompetitive justification for the rule.[2]

■ Only unreasonable restraints are unlawful. *State Oil Co. v. Khan,* —— U.S. ——, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997). Accordingly, the plaintiffs here must demonstrate that the FIFA transfer fee rule, "under all the circumstances of the case ... imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 343, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). To evaluate whether a particular restriction is unreasonable, the courts have employed one of two "complementary categories of antitrust analysis." *National Soc'y of Professional Eng'rs v.*

*United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

> In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se.*' In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.

*Id.* "*Per se* treatment is appropriate '[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.' " *State Oil,* —— U.S. at ——, 118 S.Ct. at 279 (quoting *Maricopa,* 457 U.S. at 344, 102 S.Ct. 2466). A *per se* rule is in effect "a judicial shortcut; it represents the considered judgment of courts, after considerable experience with a particular type of restraint, that the rule of reason the normal mode of analysis can be dispensed with." *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1181 (D.C.Cir.1978). Because "[i]nvocation of a *per se* rule always risks sweeping reasonable, pro-competitive activity within a general condemnation, and a court will run this risk only when it can say, on the strength of unambiguous experience, that the challenged action is a 'naked restraint of trade with no purpose except stifling of competition.' " *Id.* (citing *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963)). The Supreme Court has "expressed reluctance to adopt *per se* rules with regard to 'restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.' " *State Oil,* —— U.S. at ——, 118 S.Ct. at 279 (quoting *Federal Trade Comm'n v. Indiana Federation of Dentists,* 476 U.S. 447, 458–59, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)). In contrast, analyzing an arrangement under a rule of reason requires consideration of its anticompetitive effects and a weighing of those effects against any "legitimate business justi-

---

**2.** It may be noted that MLS's obligation, as a member of FIFA, to observe the federation's rules is sufficient to constitute a "contract, combination ... or conspiracy" within the scope of the Sherman Act's prohibition. *See Hennessey v.*

*National Collegiate Athletic Ass'n,* 564 F.2d 1136, 1147 (5th Cir.1977) (adherence to a trade association by law may suffice to establish "the agreement and concert of action of the various members of the association").

fications." *Clamp–All Corp. v. Cast Iron Soil Pipe Inst.,* 851 F.2d 478, 486 (1st Cir. 1988) (citing 7 P. Areeda & D. Turner, *Antitrust Law* ¶ 1500, at 362–63 (1978)), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989).

The categories of agreements that have consistently been deemed *per se* unlawful include horizontal price-fixing and certain group boycotts. *See, e.g., United States v. General Motors Corp.,* 384 U.S. 127, 145–46, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 212–13, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild of Am. v. Federal Trade Comm'n,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). With these cases in mind, the plaintiffs attempt to characterize the transfer fee rule as either a price-fixing agreement or a group boycott, but the rule resists easy characterization. Regardless of the label attached to it, however, the agreement is one among horizontal competitors restricting, in some degree, a club's ability to sign an out-of-contract soccer player. Whether such agreements occurring among horizontal competitors are labeled "group boycotts" or "price-fixing," they tend to reduce competition.

As a general matter, agreements of this sort impose unreasonable restraints on competition, and therefore, again as a general matter, they are subject to *per se* condemnation. A significant exception to this general proposition has been recognized where the horizontal agreement has the characteristics of a joint venture and where it has as its purpose and effect an efficient or procompetitive outcome. In such cases, horizontal arrangements have been analyzed under a rule of reason. *See National Collegiate Athletic Ass'n v. Board of Regents,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (agreement to limit the sale of television rights in NCAA); *Indiana Federation of Dentists,* 476 U.S. at 447, 106 S.Ct. 2009.

Rules restricting the ability of sports teams to hire players have been subject to antitrust scrutiny before. In *Mackey v. National Football League,* 543 F.2d 606 (8th Cir.1976), the Court examined the legality of the "Rozelle rule" which allowed the league commissioner to require a club acquiring a free agent (that is, an "out-of-contract" player) to compensate the player's former club, unless the two clubs could arrive at a mutually satisfactory arrangement. The court characterized that rule as a "group boycott" because the teams had agreed that they would sign a free agent only in specific circumstances. *Mackey,* 543 F.2d at 618. Nevertheless, the court declined to hold that the "Rozelle rule" was a *per se* violation of the antitrust rules, although it did eventually determine, applying a "rule of reason," that the rule amounted to an unreasonable restraint of trade. Similarly, in *Smith,* 593 F.2d at 1173, while characterizing the professional football player draft, pursuant to which professional football clubs refused to deal with persons drafted by another club, as a group boycott, the court nevertheless rejected the argument that it was illegal *per se* but rather analyzed the arrangement under a "rule of reason."

These courts recognized that, because the market for professional sports entertainment requires some form of cooperation among the teams and because the "boycott" is not aimed at driving competitors out of that market, the challenged restraints are different from the classic group boycott, which is a "concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." *Smith,* 593 F.2d at 1178. In *Mackey,* the court emphasized that the teams making up the National Football League (the "NFL") were not competitors in the traditional sense, and that the NFL assumed some of the characteristics of a joint venture in that "each member club has a stake in the success of the other teams. No one club is interested in driving another team out of business, since if the league fails, no one team can survive." *Mackey,* 543 F.2d at 619 (citing *United States v. National Football League,* 116 F.Supp. 319, 323 (E.D.Pa. 1953)). In *Smith* the court expanded this analysis by concluding that not only were the teams not competitors in the traditional sense, but that because "NFL clubs have not combined to exclude competitors or potential competitors from their level of the market" the team's refusal to deal with a player draft-

ed by another team "has resulted in no decrease in the competition for providing football entertainment to the public. The draft, indeed, is designed not to insulate the NFL from competition, but to improve the entertainment product by enhancing its teams' competitive equality." *Smith,* 593 F.2d at 1179.

The Court of Appeals for this Circuit has cautioned against applying a *per se* analysis too readily to situations which do not fit the traditional model. "[C]are must be taken that the challenged conduct fits into a proscribed category without distortion, for it is the similarity to past conduct whose harmfulness has been settled that allows the inference, without further inquiry, that this manifestation is harmful." *M & H Tire Co., Inc. v. Hoosier Racing Tire Corp.,* 733 F.2d 973 (1st Cir.1984). "A claim of boycott ... invites particular caution: boycotts are not a unitary phenomenon." *Id.* at 977 (citations omitted).

The plaintiffs say that these considerations do not apply because the FIFA transfer fee arrangement involves an agreement among unrelated competitors—not competitors within a single sports league. It is true that FIFA is not a single sports league, but this does not answer the question whether the FIFA arrangement has some of the procompetitive characteristics of a joint venture, or whether it primarily restricts competition. There is no accumulated judicial experience analyzing the rules of international sports federations in the light of antitrust principles, and "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed" need to be examined. *Professional Eng'rs,* 435 U.S. at 692, 98 S.Ct. 1355.

For many of the same reasons, the rule cannot be condemned as *per se* illegal price-fixing. The plaintiffs characterize the agreement as a price-fixing conspiracy because it reflects an agreement among buyers of player services having the effect of lowering the price of those services. Presumably, this could also have the effect of lowering the cost to the end-product consumer—the person attending a soccer match. It can be appropriate to consider the procompetitive effects of a restraint that might be felt in a market other than the one in which the restraint operates. For instance, a restraint on competition in the market for player services might have corresponding, and necessary, procompetitive effects in the market for soccer matches or for sports entertainment generally. *See, e.g., National Collegiate,* 468 U.S. at 115–20, 104 S.Ct. 2948 (considering the NCAA's interest in protecting live attendance at untelevised games and the NCAA's "legitimate and important" interest in maintaining competitive balance between amateur athletic teams as a justification for a restraint that operated in a completely different market, the market for the telecasting of collegiate football games).

The Court of Appeals has noted that "the Congress that enacted the Sherman Act saw it as a way of protecting consumers against prices that were too high, not too low. And, the relevant economic considerations may be very different when low prices, rather than high prices are at issue. These facts suggest that courts at least should be cautious—reluctant to condemn too speedily—an arrangement that, on its face, appears to bring low price benefits to the consumer." *Kartell v. Blue Shield of Mass., Inc.,* 749 F.2d 922, 931 (1st Cir.1984) (citations omitted). While it is not immediately clear that the transfer fee rule actually has this effect, it is not obviously out of the question that one of the effects of lower player salaries is lower prices for the consumer. Under a rule of reason, depending on all the circumstances that may or may not justify the restraint. *See, e.g., State Oil,* —— U.S. at ——, 118 S.Ct. at 281 (emphasizing that low prices "benefit consumers regardless of how those prices are set, and so long as they are above predatory, levels, they do not threaten competition").

In *Sullivan v. National Football League,* 34 F.3d 1091 (1st Cir.1994), the NFL sought to justify its prohibition on public ownership of teams—a restraint in the market for NFL ownership—by arguing that the policy "enhanced the NFL's ability to effectively produce and present a popular entertainment product unimpaired by the conflicting interests that public ownership would cause." *Id.* at 1113. The court concluded that it was

error for the district court to have refused to allow the NFL the opportunity to do so. Although it did not resolve the question definitively, the court noted that it was appropriate "in some cases to balance the anticompetitive effects on competition in one market with certain procompetitive benefits in other markets," especially where the markets are "closely related." *Id.* at 1112.

The restraint imposed by the FIFA transfer fee rules should be examined in the light of a "rule of reason."

### CONCLUSION

For the foregoing reasons the plaintiffs' motion for summary judgment and the defendants' cross motion for summary, judgment are DENIED.

SO ORDERED.