BOEHM, J.,
dissenting.
It is obvious, I think, that Arthur Baird has suffered from significant mental illness dating from the time he murdered his pregnant wife and his parents in 1985. The cireumstances supporting this conclusion are documented in the opinions of this Court affirming his conviction, Baird v. State, 604 N.E.2d 1170 (Ind.1992) and affirming the denial of post-conviction relief. Baird v. State, 688 N.E.2d 911 (Ind.1998). In short form, Baird, who had no criminal history, apparently suffered from the delusion that he was about to be paid $1 million by the federal government for his advice as to how to manage the national debt. He had arranged to buy a farm with the anticipated proceeds, and that deal was to be closed the day before the murders. A variety of expert opinion was offered at trial to the effect that he suffered from delusions. Psychiatrists were divided as to whether, at the time of the murders, he knew what he was doing and could appre-clate the wrongfulness of his acts. The jury found him guilty, rejecting his insanity defense under that standard. The issue before us now is whether he is currently *33 "insane" under the different standard of the Eighth Amendment prohibition against execution of an "insane" person.
The interpretation of the Eighth Amendment is, of course, a matter of federal constitutional law, and we are bound by the rulings of the Supreme Court of the United States on that point. Equally obviously, there is nothing in the Eighth Amendment that prevents a State from imposing a more restrictive standard for execution of persons with mental illness, or, for that matter, from doing away with the death penalty altogether. Because of its irreversibility, apart from whatever one thinks of its morality, we should err on the side of caution in carrying out an execution. The majority cites Justice Powell's concurrence in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) as the standard established by the Supreme Court as the definition of an "insane" person for purposes of the Kighth Amendment. Under that formulation persons are insane and ineligible for execution if they are "unaware of the punishment they are about to suffer and why they are to suffer it." Id. at 422, 106 S.Ct. 2595. For the reasons given below, I do not believe the Eighth Amendment standard is as clear as the majority would have it. But even if we accept Justice Powell's language in Ford as the definitive standard, I think the facts are sufficiently murky that we should permit Baird's petition to go forward.
Two attorneys who have dealt recently with Baird express their views that he is not competent to be executed. Obviously, their opinions are neither tied to a precise standard of "competency to be executed," nor based on any particular qualifications. His attorneys cite facts that, at the very least, lead one to conclude that Baird is only marginally in touch with reality. They report that at one level he understands that an execution is scheduled, but it is not at all clear that he has internalized this information and believes that he is in fact to be executed. We now have the report of Philip Coons, M.D., a practicing psychiatrist and emeritus professor of psychiatry at Indiana University School of Medicine. Based on his interview with Baird on August 18, 2005, less than two weeks before the scheduled execution date, Dr. Coons also expresses the opinion that Baird is "incompetent to be executed." Dr. Coons expressly declines to choose among legal standards for "competency to be executed," but asserts that Baird is not malingering, is "grossly psychotic and delusional," and "cannot feel guilt about the murders." His inability to "feel guilt" is apparently based on his belief that "he did not choose to murder his wife and parents." Rather, according to Dr. Coons, Baird believes that "his hands murdered his wife and parents while under the control of unseen forces and persons." Baird also professes a belief that time will be rolled back to the point that the murders can be undone, and that God will cause this to happen. His apparent indifference to the actions one anticipating death might take (Gnattention to a will; savings for periods long beyond execution date) seems consistent with this.
In short, I think it is plain that Baird is insane by any ordinary understanding of that term. Whether he meets the Eighth amendment standard of insanity that precludes his execution is less clear. But whether he is "aware of the punishment" as that term appears in Ford seems to me to be at least debatable, given his apparent belief that higher powers will intercede to "roll back" time to a point antedating the murders. It is also less than clear whether a person who genuinely believes he committed the acts under the control of others understands "why" he is to be punished. Under these circumstances, I *34 would grant Baird's request to file a successive petition for post-conviction relief to explore the issue never adjudicated in his earlier appeals, namely his current mental condition judged by the Eighth Amendment standard that prohibits execution of the insane. ’
The legislature in this state has made clear that it wishes to impose the death penalty in some cases, but unlike almost all other states, Indiana has no specific statutory provision addressing either the standard of insanity or any procedural requirements to guard against execution of the insane. I therefore agree with the majority that under Indiana law the Eighth Amendment remains the only substantive bar to Baird's execution. It is less clear that the oft-quoted standard from Justice Powell's concurrence in Ford is the definitive formulation of the Eighth Amendment standard for eligibility to be executed.
Writing in Ford for himself alone, Justice Powell offered the above quoted definition of insane persons as the Eighth Amendment standard. Three years after Ford, the Supreme Court held that executions of mentally retarded persons and juveniles were permissible under the Eighth Amendment. Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (mentally retarded); Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (juveniles). In Penry, Justice O'Connor, writing for herself, the Chief Justice, and Justices White, Scalia and Kennedy, quoted Justice Powell's standard, and many state and federal courts have taken this as a definitive endorsement of that language by the Supreme Court. This language is not, however, in the category of square holdings that are entitled to complete deference as definitive rulings of the Supreme Court. Only Justice Powell, who provided the fifth and deciding vote in Ford, embraced that formulation in that case. The reference in Penry is a description of Ford in a case upholding execution of a mentally retarded person, where the standard for insanity was not in.issue. I agree that many courts have taken the Penry language as an endorsement of the Powell formulation by a majority of the Supreme Court. I nonetheless note that the Perry description is as susceptible of being read as a minimum standard, without necessarily formulating the precise standard. In any event it is dicta, not a holding, and the Supreme Court has not.spoken since.
More importantly, both Penry and Stanford have now been overruled. See Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (execution of the mentally retarded violates the Eighth Amendment); Roper v. Simmons, - U.S. -, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (execution of juveniles violates the Eighth Amendment). In the course of reexamining Penry and Stanford, more than a majority of the Supreme Court has described the basis for the Eighth Amendment's prohibition against execution of the mentally retarded as "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Atkins, 536 U.S. at 318, 122 S.Ct. 2242; Roper, 125 S.Ct. at 1209 (O'Connor, J., dissenting, quoting Atkins majority). The objective facts cited by Baird's attorneys, if proven, would seem to fit this description, though his impairment is not mental retardation, as that condition is usually understood, but mental illness.
Atkins may carry another implication for the Ford formulation. Atkins held that the Eighth Amendment prohibits execution of a mentally retarded person, but famously left open the definition of mental *35 retardation. Specifically, Atkins stated "As was our approach in Ford v. Wainwright ... with regard to insanity, 'we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences" 536 U.S. at 317, 122 S.Ct. 2242. Although Ford itself may have been taken to address only the procedures through which insanity may be addressed and determined, it is very clear that A+ kins left to the States both the standard of mental retardation and also any procedural issues involved in determining whether a person meets that standard. If we take literally the "as was our approach in Ford," the definition of insanity, like that of mental retardation, is left to the States to work out. Whether the net result is to leave the definition of insanity to the States remains an open issue after Atkins. And even if we ultimately arrive at a uniform federal standard, the precise nature of that standard remains to be definitively established. Certainly a different evolving national consensus as to mental retardation was identified in Atkins compared to that found in Penry. All of this leads me to exercise extreme caution in executing a person whose mental health is plainly questionable unless we can be certain the person does not meet the Ford standard, much less another more restrictive standard that may now apply in light of Atkins and Roper.
Finally, Atkins reemphasized the longstanding doctrine that the severity of the punishment must be correlated to the culpability of the defendant. 536 U.S. at 311, 122 S.Ct. 2242. The ability to relate to reality is surely a component of culpability. Even if Justice Powell's formulation of the standard of insanity is the law, both Ford and Atkins make clear that States are to work out the procedures by which an individual's sanity is to be determined. Some States have adopted rather specific procedures, for example calling for prison officials or the executive branch to initiate an examination of death row inmates whose sanity is in question.[3] Indiana has no such statutory procedure. We have provided by judicial rule and decision for the possibility of a successive petition for post-conviction relief to determine sanity, but have no clear guidelines as to what triggers that procedure other than the general provision of P.C.R. 2 that the petitioner must show a "reasonable possibility" that he or she is entitled to relief. In the absence of any guidance from the legislature on this point, we should construe that provision generously if in doubt.
I certainly agree with the majority on the elementary and fundamental point that we are bound by decisions of the United States Supreme Court on questions of federal law. Justice O'Connor, dissenting in Roper, expressed frustration at her colleagues' refusal to "reprove, or even acknowledge, the Supreme Court of Missouri's unabashed refusal to follow [the U.S. Supreme Court's] controlling decision in Stanford." 125 S.Ct. at 1209. She noted several recent cases in which the Supreme Court of the United States has held *36 that it is its "prerogative alone to overrule one of its precedents." Roper itself, and each of the other cases Justice O'Connor cited with respect to deference to Supreme Court precedent, overruled a prior holding that had established a clear rule of law.[4] Here we are dealing with the meaning of "insane," a term that was not elaborated by a majority of the Court that used the term in Ford, and has never been squarely addressed by the Court since then. That is not the sort of precedent that demands unquestioning fidelity in the face of subsequent language from the Supreme Court itself that raises legitimate questions as to the meaning of the term. In any event, as indicated above, I believe Baird has shown a "reasonable possibility" that he may be insane, even under Justice Powell's formulation. That is the test of P.C.R. 2, and I believe Baird should be given an opportunity to make his case.
RUCKER, J., joins.

. See, e.g., Conn. Gen. Stat § 15-101 (2004) (if the person "appears to the warden to be insane" an application to a court for psychiatric exam is to be made); Fla. Stat. § 922.07 (2005) ("when the Governor is informed that a person under sentence of death may be insane" a commission of psychiatrists is to be appointed); Nev.Rev.Stat. § 176.425 (2004) (if "there is a good reason to believe that the defendant has become insane" the director of the department of corrections "may" petition a court to trigger a sanity hearing); Ohio Rev.Code Ann. § 2949.28 (LexisNexis 2005) ("If a convict sentenced to death appears to be insane" the official in charge of the institution having custody "shall" give notice to the court that imposed the sentence).

. Roper held that persons under the age of eighteen may not be executed, overruling Stanford on that point of Eighth Amendment law. State Oil Co. v. Khan, 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) held that vertical maximum price fixing is not a per se violation of the Sherman Act, overruling Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). United States v. Hatter, 532 U.S. 557, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001) held that a general tax law can be applied to federal judges appointed before the effective date of the tax, overruling Evans v. Gore, 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887 (1920). Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) held that agreements to arbitrate claims under the Securities Act are enforceable, overruling Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).