Justice Breyer,
with whom Justice Stevens, Justice Souter, and Justice Ginsburg join, dissenting.
In Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U. S. 373, 394, 408-409 (1911), this Court held that an agreement between a manufacturer of proprietary medicines and its dealers to fix the minimum price at which its medicines could be sold was “invalid . . . under the [Sherman Act, 15 U. S. C. § 1].” This Court has consistently read Dr. Miles as establishing a bright-line rule that agreements fixing minimum resale prices are per se illegal. See, e.g., United States v. Trenton Potteries Co., 273 U. S. 392, 399-401 (1927); NYNEX Corp. v. Discon, Inc., 525 U. S. 128, 133 (1998). That per se rule is one upon which the legal profession, business, and the public have relied for close to a century. Today the Court holds that courts must determine the lawfulness of minimum resale price maintenance by applying, not a bright-line per se rule, but a circumstance-specific “rule of reason.” Ante, at 907. And in doing so it overturns Dr. Miles.
The Court justifies its departure from ordinary considerations of stare decisis by pointing to a set of arguments well known in the antitrust literature for close to half a century. See ante, at 889-892. Congress has repeatedly found in these arguments insufficient grounds for overturning the per se rule. See, e. g., Hearings on H. R. 10527 et al. before the Subcommittee on Commerce and Finance of the House Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess., 74-76, 89, 99, 101-102, 192-195, 261-262 (1958). And, *909 in my view, they do not warrant the Court’s now overturning so well-established a legal precedent.
I
The Sherman Act seeks to maintain a marketplace free of anticompetitive practices, in particular those enforced by agreement among private firms. The law assumes that such a marketplace, free of private restrictions, will tend to bring about the lower prices, better products, and more efficient production processes that consumers typically desire. In determining the lawfulness of particular practices, courts often apply a “rule of reason.” They examine both a practice’s likely anticompetitive effects and its beneficial business justifications. See, e. g., National Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla., 468 U. S. 85, 109-110, and n. 39 (1984); National Soc. of Professional Engineers v. United States, 435 U. S. 679, 688-691 (1978); Board of Trade of Chicago v. United States, 246 U. S. 231, 238 (1918).
Nonetheless, sometimes the likely anticompetitive consequences of a particular practice are so serious and the potential justifications so few (or, e. g., so difficult to prove) that courts have departed from a pure “rule of reason” approach. And sometimes this Court has imposed a rule of per se unlawfulness — a rule that instructs courts to find the practice unlawful all (or nearly all) the time. See, e. g., NYNEX, supra, at 133; Arizona v. Maricopa County Medical Soc., 457 U. S. 332, 343-344, and n. 16 (1982); Continental T. V., Inc. v. GTE Sylvania Inc., 433 U. S. 36, 50, n. 16 (1977); United States v. Topco Associates, Inc., 405 U. S. 596, 609-611 (1972); United States v. Socony-Vacuum Oil Co., 310 U. S. 150, 213-214 (1940) (citing and quoting Trenton Potteries, supra, at 397-398).
The case before us asks which kind of approach the courts should follow where minimum resale price maintenance is at issue. Should they apply a per se rule (or a variation) that *910 would make minimum resale price maintenance always (or almost always) unlawful? Should they apply a “rule of reason”? Were the Court writing on a blank slate, I would find these questions difficult. But, of course, the Court is not writing on a blank slate, and that fact makes a considerable legal difference.
To best explain why the question would be difficult were we deciding it afresh, I briefly summarize several classical arguments for and against the use of a per se rule. The arguments focus on three sets of considerations, those involving: (1) potential anticompetitive effects, (2) potential benefits, and (3) administration. The difficulty arises out of the fact that the different sets of considerations point in different directions. See, e.g., 8 P. Areeda, Antitrust Law ¶¶ 1628-1633, pp. 330-392 (1st ed. 1989) (hereinafter Areeda); 8 P. Areeda & H. Hovenkamp, Antitrust Law ¶¶ 1628-1633, pp. 288-339 (2d ed. 2004) (hereinafter Areeda & Hovenkamp); Easterbrook, Vertical Arrangements and the Rule of Reason, 53 Antitrust L. J. 135,146-152 (1984) (hereinafter Easterbrook); Pitofsky, In Defense of Discounters: The No-Frills Case for a Per Se Rule Against Vertical Price Fixing, 71 Geo. L. J. 1487 (1983) (hereinafter Pitofsky); Scherer, The Economics of Vertical Restraints, 52 Antitrust L. J. 687, 706-707 (1983) (hereinafter Scherer); Posner, The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality, 48 U. Chi. L. Rev. 6, 22-26 (1981); Brief for William S. Comanor et al. as Amici Curiae 7-10.
On the one hand, agreements setting minimum resale prices may have serious anticompetitive consequences. In respect to dealers: Resale price maintenance agreements, rather like horizontal price agreements, can diminish or eliminate price competition among dealers of a single brand or (if practiced generally by manufacturers) among multibrand dealers. In doing so, they can prevent dealers from offering customers the lower prices that many customers prefer; they can prevent dealers from responding to changes *911 in demand, say, falling demand, by cutting prices; they can encourage dealers to substitute service, for price, competition, thereby threatening wastefully to attract too many resources into that portion of the industry; they can inhibit expansion by more efficient dealers whose lower prices might otherwise attract more customers, stifling the development of new, more efficient modes of retailing; and so forth. See, e. g., 8 Areeda & Hovenkamp ¶ 1632c, at 319-321; Steiner, The Evolution and Applications of Dual-Stage Thinking, 49 The Antitrust Bulletin 877, 899-900 (2004); Comanor, Vertical Price-Fixing, Vertical Market Restrictions, and the New Antitrust Policy, 98 Harv. L. Rev. 983, 990-1000 (1985).
In respect to producers: Resale price maintenance agreements can help to reinforce the competition-inhibiting behavior of firms in concentrated industries. In such industries firms may tacitly collude, i. e., observe each other’s pricing behavior, each understanding that price cutting by one firm is likely to trigger price competition by all. See 8 Areeda & Hovenkamp ¶ 1632d, at 321-323; P. Areeda & L. Kaplow, Antitrust Analysis ¶¶ 231-233, pp. 276-283 (4th ed. 1988) (hereinafter Areeda & Kaplow). Cf. United States v. Container Corp. of America, 393 U. S. 333 (1969); Areeda & Kaplow ¶¶ 247-253, at 327-348. Where that is so, resale price maintenance can make it easier for each producer to identify (by observing retail markets) when a competitor has begun to cut prices. And a producer who cuts wholesale prices without lowering the minimum resale price will stand to gain little, if anything, in increased profits, because the dealer will be unable to stimulate increased consumer demand by passing along the producer’s price cut to consumers. In either case, resale price maintenance agreements will tend to prevent price competition from “breaking out”; and they will thereby tend to stabilize producer prices. See Pitofsky 1490-1491. Cf., e.g., Container Corp., supra, at 336-337.
*912 Those who express concern about the potential anticompetitive effects find empirical support in the behavior of prices before, and then after, Congress in 1975 repealed the Miller-Tydings Fair Trade Act, 50 Stat. 693, and the McGuire Act, 66 Stat. 631. Those Acts had permitted (but not required) individual States to enact “fair trade” laws authorizing minimum resale price maintenance. At the time of repeal minimum resale price maintenance was lawful in 36 States; it was unlawful in 14 States. See Hearings on S. 408 before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 173 (1975) (hereinafter Hearings on S. 408) (statement of Thomas E. Kauper, Assistant Attorney General, Antitrust Division). Comparing prices in the former States with prices in the latter States, the Department of Justice argued that minimum resale price maintenance had raised prices by 19% to 27%. See Hearings on H. R. 2384 before the Subcommittee on Monopolies and Commercial Law of the House Committee on the Judiciary, 94th Cong., 1st Sess., 122 (1975) (hereinafter Hearings on H. R. 2384) (statement of Keith I. Clearwaters, Deputy Assistant Attorney General, Antitrust Division).
After repeal, minimum resale price maintenance agreements were unlawful per se in every State. The Federal Trade Commission (FTC) staff, after studying numerous price surveys, wrote that collectively the surveys “indicate[d] that [resale price maintenance] in most cases increased the prices of products sold with [resale price maintenance].” Bureau of Economics Staff Report to the FTC, T. Overstreet, Resale Price Maintenance: Economic Theories and Empirical Evidence 160 (1983) (hereinafter Overstreet). Most economists today agree that, in the words of a prominent antitrust treatise, “resale price maintenance tends to produce higher consumer prices than would otherwise be the case.” 8 Areeda & Hovenkamp ¶ 1604b, at 40 (finding “[t]he evidence . . . persuasive on this point”). See also Brief for William S. Comanor et al. as Amici Curiae 4 (“It is uni *913 formly acknowledged that [resale price maintenance] and other vertical restraints lead to higher consumer prices”).
On the other hand, those favoring resale price maintenance have long argued that resale price maintenance agreements can provide important consumer benefits. The majority lists two: First, such agreements can facilitate new entry. Ante, at 891. For example, a newly entering producer wishing to build a product name might be able to convince dealers to help it do so — if, but only if, the producer can assure those dealers that they will later recoup their investment. Without resale price maintenance, late-entering dealers might take advantage of the earlier investment and, through price competition, drive prices down to the point where the early dealers cannot recover what they spent. By assuring the initial dealers that such later price competition will not occur, resale price maintenance can encourage them to carry the new product, thereby helping the new producer succeed. See 8 Areeda & Hovenkamp ¶¶ 1617a, 1631b, at 193-196, 308. The result might be increased competition at the producer level, i.e., greater inter-brand competition, that brings with it net consumer benefits.
Second, without resale price maintenance a producer might find its efforts to sell a product undermined by what resale price maintenance advocates call “free riding.” Ante, at 890-891. Suppose a producer concludes that it can succeed only if dealers provide certain services, say, product demonstrations, high quality shops, advertising that creates a certain product image, and so forth. Without resale price maintenance, some dealers might take a “free ride” on the investment that others make in providing those services. Such a dealer would save money by not paying for those services and could consequently cut its own price and increase its own sales. Under these circumstances, dealers might prove unwilling to invest in the provision of necessary services. See, e. g., 8 Areeda & Hovenkamp ¶¶ 1611-1613, *914 1631c, at 126-165, 309-313; R. Posner, Antitrust Law 172-173 (2d ed. 2001); R. Bork, The Antitrust Paradox 290-291 (1978) (hereinafter Bork); Easterbrook 146-149.
Moreover, where a producer and not a group of dealers seeks a resale price maintenance agreement, there is a special reason to believe some such benefits exist. That is because, other things being equal, producers should want to encourage price competition among their dealers. By doing so they will often increase profits by selling more of their product. See Sylvania, 433 U. S., at 56, n. 24; Bork 290. And that is so, even if the producer possesses sufficient market power to earn a supernormal profit. That is to say, other things being equal, the producer will benefit by charging his dealers a competitive (or even a higher-than-competitive) wholesale price while encouraging price competition among them. Hence, if the producer is the moving force, the producer must have some special reason for wanting resale price maintenance; and in the absence of, say, concentrated producer markets (where that special reason might consist of a desire to stabilize wholesale prices), that special reason may well reflect the special circumstances just described: new entry, “free riding,” or variations on those themes.
The upshot is, as many economists suggest, sometimes resale price maintenance can prove harmful; sometimes it can bring benefits. See, e. g., Brief for Economists as Amici Curiae 16; 8 Areeda & Hovenkamp ¶¶ 1631-1632, at 306-328; Pitofsky 1495; Scherer 706-707. But before concluding that courts should consequently apply a rule of reason, I would ask such questions as, how often are harms or benefits likely to occur? How easy is it to separate the beneficial sheep from the antitrust goats?
Economic discussion, such as the studies the Court relies upon, can help provide answers to these questions, and in doing so, economics can, and should, inform antitrust law. But antitrust law cannot, and should not, precisely replicate *915 economists’ (sometimes conflicting) views. That is because law, unlike economics, is an administrative system the effects of which depend upon the content of rules and precedents only as they are applied by judges and juries in courts and by lawyers advising their clients. And that fact means that courts will often bring their own administrative judgment to bear, sometimes applying rules of per se unlawfulness to business practices even when those practices sometimes produce benefits. See, e. g., F. Scherer & D. Ross, Industrial Market Structure and Economic Performance 335-339 (3d ed. 1990) (hereinafter Scherer & Ross) (describing some circumstances under which price-fixing agreements could be more beneficial than “unfettered competition,” but also noting potential costs of moving from a per se ban to a rule of reasonableness assessment of such agreements).
I have already described studies and analyses that suggest (though they cannot prove) that resale price maintenance can cause harms with some regularity — and certainly when dealers are the driving foree. But what about benefits? How often, for example, will the benefits to which the Court points occur in practice? I can find no economic consensus on this point. There is a consensus in the literature that “free riding” takes place. But “free riding” often takes place in the economy without any legal effort to stop it. Many visitors to California take free rides on the Pacific Coast Highway. We all benefit freely from ideas, such as that of creating the first supermarket. Dealers often take a “free ride” on investments that others have made in building a product’s name and reputation. The question is how often the “free riding” problem is serious enough significantly to deter dealer investment.
To be more specific, one can easily imagine a dealer who refuses to provide important presale services, say, a detailed explanation of how a product works (or who fails to provide a proper atmosphere in which to sell expensive perfume or alligator billfolds), lest customers use that “free” service (or *916 enjoy the psychological benefit arising when a high-priced retailer stocks a particular brand of billfold or handbag) and then buy from another dealer at a lower price. Sometimes this must happen in reality. But does it happen often? We do, after all, live in an economy where firms, despite Dr. Miles’ per se rule, still sell complex technical equipment (as well as expensive perfume and alligator billfolds) to consumers.
All this is to say that the ultimate question is not whether, but how much, “free riding” of this sort takes place. And, after reading the briefs, I must answer that question with an uncertain “sometimes.” See, e. g., Brief for William S. Comanor et al. as Amici Curiae 6-7 (noting “skepticism in the economic literature about how often [free riding] actually occurs”); Scherer & Ross 551-555 (explaining the “severe limitations” of the free-rider justification for resale price maintenance); Pitofsky, Why Dr. Miles Was Right, 8 Regulation, No. 1, pp. 27,29-30 (Jan./Feb. 1984) (similar analysis).
How easily can courts identify instances in which the benefits are likely to outweigh potential harms? My own answer is, not very easily. For one thing, it is often difficult to identify who — producer or dealer — is the moving force behind any given resale price maintenance agreement. Suppose, for example, several large multibrand retailers all sell resale-price-maintained products. Suppose further that small producers set retail prices because they fear that, otherwise, the large retailers will favor (say, by allocating better shelf space) the goods of other producers who practice resale price maintenance. Who “initiated” this practice, the retailers hoping for considerable insulation from retail competition, or the producers, who simply seek to deal best with the circumstances they find? For another thing, as I just said, it is difficult to determine just when, and where, the “free riding” problem is serious enough to warrant legal protection.
*917 I recognize that scholars have sought to develop checklists and sets of questions that will help courts separate instances where anticompetitive harms are more likely from instances where only benefits are likely to be found. See, e.g., 8 Areeda & Hovenkamp ¶¶ 1633e-1633e, at 330-339. See also Brief for William S. Comanor et al. as Amici Curiae 8-10. But applying these criteria in court is often easier said than done. The Court’s invitation to consider the existence of “market power,” for example, ante, at 898, invites lengthy time-consuming argument among competing experts, as they seek to apply abstract, highly technical, criteria to often ill-defined markets. And resale price maintenance cases, unlike a major merger or monopoly case, are likely to prove numerous and involve only private parties. One cannot fairly expect judges and juries in such cases to apply complex economic criteria without making a considerable number of mistakes, which themselves may impose serious costs. See, e.g., H. Hovenkamp, The Antitrust Enterprise 105 (2005) (litigating a rule of reason case is “one of the most costly procedures in antitrust practice”). See also Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226,238-247 (1960) (describing lengthy FTC efforts to apply complex criteria in a merger case).
Are there special advantages to a bright-line rule? Without such a rule, it is often unfair, and consequently impractical, for enforcement officials to bring criminal proceedings. And since enforcement resources are limited, that loss may tempt some producers or dealers to enter into agreements that are, on balance, anticompetitive.
Given the uncertainties that surround key items in the overall balance sheet, particularly in respect to the “administrative” questions, I can concede to the majority that the problem is difficult. And, if forced to decide now, at most I might agree that the per se rule should be slightly modified to allow an exception for the more easily identifiable *918 and temporary condition of “new entry.” See Pitofsky 1495. But I am not now forced to decide this question. The question before us is not what should be the rule, starting from scratch. We here must decide whether to change a clear and simple price-related antitrust rule that the courts have applied for nearly a century.
II
We write, not on a blank slate, but on a slate that begins with Dr. Miles and goes on to list a century’s worth of similar cases, massive amounts of advice that lawyers have provided their clients, and untold numbers of business decisions those clients have taken in reliance upon that advice. See, e. g., United States v. Bausch & Lomb Optical Co., 321 U. S. 707, 721 (1944); Sylvania, 433 U. S., at 51, n. 18 (“The per se illegality of [vertical] price restrictions has been established firmly for many years . . . ”). Indeed, a Westlaw search shows that Dr. Miles itself has been cited dozens of times in this Court and hundreds of times in lower courts. Those who wish this Court to change so well-established a legal precedent bear a heavy burden of proof. See Illinois Brick Co. v. Illinois, 431 U. S. 720, 736 (1977) (noting, in declining to overrule an earlier case interpreting §4 of the Clayton Act, that “considerations of stare decisis weigh heavily in the area of statutory construction, where Congress is free to change this Court’s interpretation of its legislation”). I am not aware of any case in which this Court has overturned so well-established a statutory precedent. Regardless, I do not see how the Court can claim that ordinary criteria for overruling an earlier case have been met. See, e.g., Planned Parenthood of Southeastern Pa. v. Casey, 505 U. S. 833, 854-855 (1992). See also Federal Election Comm’n v. Wisconsin Right to Life, Inc., ante, at 500-503 (Scalia, J., concurring in part and concurring in judgment).
*919 A
I can find no change in circumstances in the past several decades that helps the majority’s position. In fact, there has been one important change that argues strongly to the contrary. In 1975, Congress repealed the McGuire and MillerTydings Acts. See Consumer Goods Pricing Act of 1975,89 Stat. 801. And it thereby consciously extended Dr. Miles’ per se rule. Indeed, at that time the Department of Justice and the FTC, then urging application of the per se rule, discussed virtually every argument. presented now to this Court as well as others not here presented. And they explained to Congress why Congress should reject them. See Hearings on S. 408, at 176-177 (statement of Thomas E. Kauper, Assistant Attorney General, Antitrust Division); id., at 170-172 (testimony of Lewis A. Engman, Chairman of the FTC); Hearings on H. R. 2384, at 113-114 (testimony of Keith I. Clearwaters, Deputy Assistant Attorney General, Antitrust Division). Congress fully understood, and consequently intended, that the result of its repeal of McGuire and Miller-Tydings would be to make minimum resale price maintenance per se unlawful. See, e. g., S. Rep. No. 94-466, pp. 1-3 (1975) (“Without [the exemptions authorized by the Miller-Tydings and McGuire Acts,] the agreements they authorize would violate the antitrust laws.... [R]epeal of the fair trade laws generally will prohibit manufacturers from enforcing resale prices”). See also Sylvania, supra, at 51, n. 18 (“Congress recently has expressed its approval of a per se analysis of vertical price restrictions by repealing those provisions of the Miller-Tydings and McGuire Acts allowing fair-trade pricing at the option of the individual States”).
Congress did not prohibit this Court from reconsidering the per se rule. But enacting major legislation premised upon the existence of that rule constitutes important public *920 reliance upon that rule. And doing so aware of the relevant arguments constitutes even stronger reliance upon the Court’s keeping the rule, at least in the absence of some significant change in respect to those arguments.
Have there been any such changes? There have been a few economic studies, described in some of the briefs, that argue, contrary to the testimony of the Justice Department and the FTC to Congress in 1975, that resale price maintenance is not harmful. One study, relying on an analysis of litigated resale price maintenance cases from 1975 to 1982, concludes that resale price maintenance does not ordinarily involve producer or dealer collusion. See Ippolito, Resale Price Maintenance: Empirical Evidence from Litigation, 34 J. Law & Econ. 263, 281-282, 292 (1991). But this study equates the failure of plaintiffs to allege collusion with the absence of collusion — an equation that overlooks the superfluous nature of allegations of horizontal collusion in a resale price maintenance case and the tacit form that such collusion might take. See H. Hovenkamp, Federal Antitrust Policy § 11.3c, p. 464, n. 19 (3d ed. 2005); supra, at 911.
The other study provides a theoretical basis for concluding that resale price maintenance “need not lead to higher retail prices.” Marvel & McCafferty, The Political Economy of Resale Price Maintenance, 94 J. Pol. Econ. 1074,1075 (1986). But this study develops a theoretical model “under the assumption that [resale price maintenance] is efficiency-enhancing.” Ibid. Its only empirical support is a 1940 study that the authors acknowledge is much criticized. See id., at 1091. And many other economists take a different view. See Brief for William S. Comanor et al. as Amici Curiae 4.
Regardless, taken together, these studies at most may offer some mild support for the majority’s position. But they cannot constitute a major change in circumstances.
Petitioner and some amici have also presented us with newer studies that show that resale price maintenance some *921 times brings consumer benefits. Overstreet 119-129 (describing numerous case studies). But the proponents of a per se rule have always conceded as much. What is remarkable about the majority’s arguments is that nothing in this respect is new. See supra, at 910, 919 (citing articles and congressional testimony going back several decades). The only new feature of these arguments lies in the fact that the most current advocates of overruling Dr. Miles have abandoned a host of other not-very-persuasive arguments upon which prior resale price maintenance proponents used to rely. See, e. g., 8 Areeda ¶ 1631a, at 350-352 (listing “ ‘[t]raditional’ justifications” for resale price maintenance).
The one arguable exception consists of the majority’s claim that “even absent free riding,” resale price maintenance “may be the most efficient way to expand the manufacturer’s market share by inducing the retailer’s performance and allowing it to use its own initiative and experience in providing valuable services.” Ante, at 892. I cannot count this as an exception, however, because I do not understand how, in the absence of free riding (and assuming competitiveness), an established producer would need resale price maintenance. Why, on these assumptions, would a dealer not “expand” its “market share” as best that dealer sees fit, obtaining appropriate payment from consumers in the process? There may be an answer to this question. But I have not seen it. And I do not think that we should place significant weight upon justifications that the parties do not explain with sufficient clarity for a generalist judge to understand.
No one claims that the American economy has changed in ways that might support the majority. Concentration in retailing has increased. See, e. g., Brief for Respondent 18 (since minimum resale price maintenance was banned nationwide in 1975, the total number of retailers has dropped while the growth in sales per store has risen); Brief for American Antitrust Institute as Amicus Curiae 17, n. 20 (citing private study reporting that the combined sales of the 10 largest *922 retailers worldwide has grown to nearly 80% of total retail sales of top 250 retailers; also quoting 1999 Organisation for Economic Co-operation and Development report stating that the “ ‘last twenty years have seen momentous changes in retail distribution including significant increases in concentration’”); Mamen, Facing Goliath: Challenging the Impacts of Supermarket Consolidation on our Local Economies, Communities, and Food Security, The Oakland Institute, 1 Policy Brief, No. 3, pp. 1, 2 (Spring 2007), http://www. oaklandinstitute.org/pdfs/facing_goliath.pdf (as visited June 25, 2007, and available in Clerk of Court’s case file) (noting that “[f)or many decades, the top five food retail firms in the U. S. controlled less than 20 percent of the market”; from 1997 to 2000, “the top five firms increased their market share from 24 to 42 percent of all retail sales”; and “[b]y 2003, they controlled over half of all grocery sales”). That change, other things being equal, may enable (and motivate) more retailers, accounting for a greater percentage of total retail sales volume, to seek resale price maintenance, thereby making it more difficult for price-cutting competitors (perhaps internet retailers) to obtain market share.
Nor has anyone argued that concentration among manufacturers that might use resale price maintenance has diminished significantly. And as far as I can tell, it has not. Consider household electrical appliances, which a study from the late 1950’s suggests constituted a significant portion of those products subject to resale price maintenance at that time. See Hollander, United States of America, in Resale Price Maintenance 67, 80-81 (B. Yamey ed. 1966). Although it is somewhat difficult to compare census data from 2002 with that from several decades ago (because of changes in the classification system), it is clear that at least some subsets of the household electrical appliance industry are more concentrated, in terms of manufacturer market power, now than they were then. For instance, the top eight domestic manufacturers of household cooking appliances accounted for 68% *923 of the domestic market (measured by value of shipments) in 1963 (the earliest date for which I was able to find data), compared with 77% in 2002. See Dept, of Commerce, Bureau of Census, 1972 Census of Manufactures, Special Report Series, Concentration Ratios in Manufacturing, No. MC72(SR)-2, p. SR2-38 (1975) (hereinafter 1972 Census); Dept, of Commerce, Bureau of Census, 2002 Economic Census, Concentration Ratios: 2002, No. EC02-31SR-1, p. 55 (2006) (hereinafter 2002 Census). The top eight domestic manufacturers of household laundry equipment accounted for 95% of the domestic market in 1963 (90% in 1958), compared with 99% in 2002. 1972 Census, at SR2-38; 2002 Census, at 55. And the top eight domestic manufacturers of household refrigerators and freezers accounted for 91% of the domestic market in 1963, compared with 95% in 2002. 1972 Census, at SR2-38; 2002 Census, at 55. Increased concentration among manufacturers increases the likelihood that producer-originated resale price maintenance will prove more prevalent today than in years past, and more harmful. At the very least, the majority has not explained how these, or other changes in the economy, could help support its position.
In sum, there is no relevant change. And without some such change, there is no ground for abandoning a well-established antitrust rule.
B
With the preceding discussion in mind, I would consult the list of factors that our case law indicates are relevant when we consider overruling an earlier case. Justice Scalia, writing separately in another of our cases this Term, "well summarizes that law. See Wisconsin Right to Life, Inc., ante, at 500-503 (opinion concurring in part and concurring in judgment). And every relevant factor he mentions argues against overruling Dr. Miles here.
First, the Court applies stare decisis more “rigidly” in statutory than in constitutional cases. See Glidden Co. v. *924 Zdanok, 370 U. S. 530, 543 (1962); Illinois Brick Co., 431 U. S., at 736. This is a statutory case.
Second, the Court does sometimes overrule cases that it decided wrongly only a reasonably short time ago. As Justice Scalia put it, “[ojverruling a constitutional case decided just a few years earlier is far from unprecedented.” Wisconsin Right to Life, ante, at 501 (emphasis added). We here overrule one statutory case, Dr. Miles, decided 100 years ago, and we overrule the cases that reaffirmed its per se rule in the intervening years. See, e. g., Trenton Potteries, 273 U. S., at 399-401; Bausch & Lomb, 321 U. S., at 721; United States v. Parke, Davis & Co., 362 U. S. 29, 45-47 (1960); Simpson v. Union Oil Co. of Cal., 377 U. S. 13, 16-17 (1964).
Third, the fact that a decision creates an “unworkable” legal regime argues in favor of overruling. See Payne v. Tennessee, 501 U. S. 808, 827-828 (1991); Swift & Co. v. Wickham, 382 U. S. 111, 116 (1965). Implementation of the per se rule, even with the complications attendant the exception allowed for in United States v. Colgate & Co., 250 U. S. 300 (1919), has proved practical over the course of the last century, particularly when compared with the many complexities of litigating a case under the “rule of reason” regime. No one has shown how moving from the Dr. Miles regime to “rule of reason” analysis would make the legal regime governing minimum resale price maintenance more “administrable,” Wisconsin Right to Life, ante, at 501 (opinion of Scalia, J.), particularly since Colgate would remain good law with respect to unreasonable price maintenance.
Fourth, the fact that a decision “unsettles” the law may argue in favor of overruling. See Sylvania, 433 U. S., at 47; Wisconsin Right to Life, ante, at 502 (opinion of Scalia, J.). The per se rule is well-settled law, as the Court itself has previously recognized. Sylvania, supra, at 51, n. 18. It is the majority’s change here that will unsettle the law.
*925 Fifth, the fact that a case involves property rights or contract rights, where reliance interests are involved, argues against overruling. Payne, supra, at 828. This case involves contract rights and perhaps property rights (consider shopping malls). And there has been considerable reliance upon the per se rule. As I have said, Congress relied upon the continued vitality of Dr. Miles when it repealed Miller-Tydings and McGuire. Supra, at 919-920. The Executive Branch argued for repeal on the assumption that Dr. Miles stated the law. Supra, at 919-920. Moreover, whole sectors of the economy have come to rely upon the per se rule. A factory outlet store tells us that the rule “form[s] an essential part of the regulatory background against which [that firm] and many other discount retailers have financed, structured, and operated their businesses.” Brief for Burlington Coat Factory Warehouse Corp. as Amicus Curiae 5. The Consumer Federation of America tells us that large low-price retailers would not exist without Dr. Miles; minimum resale price maintenance, “by stabilizing price levels and preventing low-price competition, erects a potentially insurmountable barrier to entry for such low-price innovators.” Brief for Consumer Federation of America as Amicus Curiae 5, 7-9 (discussing, inter alia, comments by Wal-Mart’s founder 25 years ago that relaxation of the per se ban on minimum resale price maintenance would be a “ ‘great danger’” to Wal-Mart’s then-relatively-naseent business). See also Brief for American Antitrust Institute as Amicus Curiae 14-15, and sources cited therein (making the same point). New distributors, including internet distributors, have similarly invested time, money, and labor in an effort to bring yet lower cost goods to Americans.
This Court’s overruling of the per se rule jeopardizes this reliance, and more. What about malls built on the assumption that a discount distributor will remain an anchor tenant? What about home buyers who have taken a home’s distance *926 from such a mall into account? What about Americans, producers, distributors, and consumers, who have understandably assumed, at least for the last 30 years, that price competition is a legally, guaranteed way of life? The majority denies none of this. It simply says that these “reliance interests ..., like the reliance interests in [State Oil Co. v.] Khan, [522 U. S. 3 (1997),] cannot justify an inefficient rule.” Ante, at 906.
The Court minimizes the importance of this reliance, adding that it “is also of note” that at the time resale price maintenance contracts were lawful “ ‘no more than a tiny fraction of manufacturers ever employed’” the practice. Ante, at 907 (quoting Overstreet 6). By “tiny” the Court means manufacturers that accounted for up to “ ‘ten percent of consumer goods purchases’” annually. Ante, at 907. That figure in today’s economy equals just over $300 billion. See Dept, of Commerce, Bureau of Census, Statistical Abstract of the United States: 2007, p. 649 (126th ed.) (over $3 trillion in U. S. retail sales in 2002). Putting the Court’s estimate together with the Justice Department’s early 1970’s study translates a legal regime that permits all resale price maintenance into retail bills that are higher by an average of roughly $750 to $1,000 annually for an American family of four. Just how much higher retail bills will be after the Court’s decision today, of course, depends upon what is now unknown, namely, how courts will decide future cases under a “rule of reason.” But these figures indicate that the amounts involved are important to American families and cannot be dismissed as “tiny.”
Sixth, the fact that a rule of law has become “embedded” in our “national culture” argues strongly against overruling. Dickerson v. United States, 530 U. S. 428, 443-444 (2000). The per se rule forbidding minimum resale price maintenance agreements has long been “embedded” in the law of antitrust. It involves price, the economy’s “ ‘central nervous system.’” National Soc. of Professional Engineers, 435 *927 U. S., at 692 (quoting Socony-Vacuum Oil, 310 U. S., at 226, n. 59). It reflects a basic antitrust assumption (that consumers often prefer lower prices to more service). It embodies a basic antitrust objective (providing consumers with a free choice about such matters). And it creates an easily administered and enforceable bright line, “Do not agree about price,” that businesses as well as lawyers have long understood.
The only contrary stare decisis factor that the majority mentions consists of its claim that this Court has “[f]rom the beginning . . . treated the Sherman Act as a common-law statute,” and has previously overruled antitrust precedent. Ante, at. 899, 900-902. It points in support to State Oil Co. v. Khan, 522 U. S. 3 (1997), overruling Albrecht v. Herald Co., 390 U. S. 145 (1968), in which this Court had held that maximum resale price agreements were unlawful per se, and to Sylvania, overruling United States v. Arnold, Schwinn & Co., 388 U. S. 365 (1967), in which this Court had held that producer-imposed territorial limits were unlawful per se.
The Court decided Khan, however, 29 years after Albrecht — still a significant period, but nowhere close to the century Dr. Miles has stood. The Court specifically noted the lack of any significant reliance upon Albrecht. 522 U. S., at 18-19 (Albrecht has had “little or no relevance to ongoing enforcement of the Sherman Act”). Albrecht had far less support in traditional antitrust principles than did Dr. Miles. Compare, e. g., 8 Areeda & Hovenkamp ¶ 1632, at 316-328 (analyzing potential harms of minimum resale price maintenance), with id., ¶ 1637, at 352-361 (analyzing potential harms of maximum resale price maintenance). See also, e. g., Pitofsky 1490, n. 17. And Congress had nowhere expressed support for Albrecht's rule. Khan, supra, at 19.
In Sylvania, the Court, in overruling Schwinn, explicitly distinguished Dr. Miles on the ground that while Congress had “recently . . . expressed its approval of a per se analysis of vertical price restrictions” by repealing the Miller *928 Tydings and McGuire Acts, “[n]o similar expression of congressional intent exists for nonprice restrictions.” 433 U. S., at 51, n. 18. Moreover, the Court decided Sylvania only a decade after Schwinn; And it based its overruling on a generally perceived need to avoid “confusion” in the law, 433 U. S., at 47-49, a factor totally absent here.
The Court suggests that it is following “the common-law tradition.” Ante, at 905. But the common law would not have permitted overruling Dr. Miles in these circumstances. Common-law courts rarely overruled well-established earlier rules outright. Rather, they would over time issue decisions that gradually eroded the scope and effect of the rule in question, which might eventually lead the courts to put the rule to rest. One can argue that modifying the per se rule to make an exception, say, for new entry, see Pitofsky 1495, could prove consistent with this approach. To swallow up a century-old precedent, potentially affecting many billions of dollars of sales, is not. The reader should compare today’s “common-law” decision with Justice Cardozo’s decision in Allegheny College v. National Chautauqua Cty. Bank of Jamestown, 246 N. Y. 369, 159 N. E. 173 (1927), and note a gradualism that does not characterize today’s decision.
Moreover, a Court that rests its decision upon economists’ views of the economic merits should also take account of legal scholars’ views about common-law overruling. Professors Hart and Sacks list 12 factors (similar to those I have mentioned) that support judicial “adherence to prior holdings.” They all support adherence to Dr. Miles here. See H. Hart & A. Sacks, The Legal Process 568-569 (W. Eskridge & P. Frickey eds. 1994). Karl Llewellyn has written that the common-law judge’s “conscious reshaping” of prior law “must so move as to hold the degree of movement down to the degree to which need truly presses.” The Bramble Bush 156 (1960). Where here is the pressing need? The Court notes that the FTC argues here in favor of a rule of reason. See ante, at 900. But both Congress and the FTC, *929 unlike courts, are well equipped to gather empirical evidence outside the context of a single case. As neither has done so, we cannot conclude with confidence that the gains from eliminating the per se rule will outweigh the costs.
In sum, every stare decisis concern this Court has ever mentioned counsels against overruling here. It is difficult for me to understand how one can believe both that (1) satisfying a set of stare decisis concerns justifies overruling a recent constitutional decision, Wisconsin Right to Life, Inc., ante, at 500-503 (Scalia, J., joined by Kennedy and Thomas, JJ., concurring in part and concurring in judgment), but (2) failing to satisfy any of those same concerns nonetheless permits overruling a longstanding statutory decision. Either those concerns are relevant or they are not.
* * *
The only safe predictions to make about today’s decision are that it will likely raise the price of goods at retail and that it will create considerable legal turbulence as lower courts seek to develop workable principles. I do not believe that the majority has shown new or changed conditions sufficient to warrant overruling a decision of such long standing. All ordinary stare decisis considerations indicate the contrary. For these reasons, with respect, I dissent.